**IN THE CIRCUIT COURT OF COLUMBIA COUNTY, ARKANSAS**
**CIVIL DIVISION**

FILED

2021 DEC 15 PM 11: 35

COLUMBIA COUNTY, AR
ANGELA KEITH
CIRCUIT CLERK

**CHARLES P. FINNEY and**
**STEPHANIE FINNEY**

**PLAINTIFFS**

No. 14CV-21-239-4

**SAEILO, INC., d/b/a KAHR ARMS**

**DEFENDANT**

## COMPLAINT

Come now the Plaintiffs, Charles P. Finney and Stephanie Finney, and hereby allege and state, as follows, their causes of action and claims for relief as against the Defendant, Saeilo Inc., d/b/a Kahr Arms, a Delaware corporation doing business in the State of Arkansas, for personal injury, loss of income, decreased earning capacity, and all other claims for relief and causes of action existing to Plaintiffs, Charles P. Finney and Stephanie Finney, as a result of the drop fire of the Kahr pistol which occurred on December 24, 2018 as alleged herein; and further allege claims for PUNITIVE DAMAGES.

1. a. That at the time of the occurrence, which is the subject of this complaint, the Plaintiffs were residents of Magnolia, Columbia County, Arkansas, United States of America. That the injuries to the Plaintiffs, upon which the claims and causes of action are alleged herein, occurred in Columbia County, State of

1

Arkansas, United States of America. Plaintiffs were, at all times relevant herein, citizens and residents of Columbia County, State of Arkansas, United States of America. Columbia County is the proper venue for the claims and causes of action alleged herein, pursuant to and in accordance with A.C.A. § 16-60-101.

b. That the matter in controversy, as alleged herein, exceeds the sum or value of $75,000.00, exclusive of interest and costs, for each item of alleged damages.

2. That the Defendant, Saeilo, Inc., d/b/a Kahr Arms, is a corporation organized and existing under the laws of the State of Delaware, duly authorized and doing business in the State of Arkansas.

3. That the Plaintiffs' causes of action and claims for relief arise from the Defendant transacting business in the State of Arkansas; transacting to supply services or things in the State of Arkansas; having caused tortuous injury in the State of Arkansas by an act or omission outside the State of Arkansas; that the Defendant regularly did and solicited business and/or engaged in other persistent courses of conduct in the State of Arkansas; said Defendant derived substantial revenues from goods manufactured, sold and/or distributed in the State of Arkansas, and from goods and/or services consumed or used in the State of Arkansas; and that the Defendant did place in the stream of commerce in the United States of America and

in the State of Arkansas the Kahr pistol, hereinafter described, which is the subject of this litigation. Said Kahr pistol was purchased by Plaintiffs via *Sportsman's Guide* online and delivered to the local store, *Shooter's*, who handled the FFL transfer, and used in the State of Arkansas.

4.     That the product (Kahr pistol) that is the subject of this litigation is described as a Kahr semi-automatic pistol, Model CW 40, serial number FG4729.

5.     That the Defendant, Saeilo, Inc., d/b/a Kahr Arms, did design, manufacture, construct, fabricate, assemble, attest, merchandise, advertise, promote, sell and/or distribute said Kahr pistol; further, said Defendant did design, write, promote and/or approve the instructional manual and advertising and sales literature with reference to the afore-described Kahr pistol.

6.     That on December 24, 2018, the Plaintiff, Charles P. Finney, who had a license to carry a concealed weapon, was carrying and had in his possession the afore-mentioned Kahr CW 40 pistol which was in a holster and strapped to Charles P. Finney's side. While Charles P. Finney was using the restroom, the Kahr CW 40 PISTOL FELL TO THE FLOOR AND DROP FIRED. The bullet from said DROP FIRE entered and exited Charles P. Finney's left leg (as per photograph attached hereto as Exhibit A), liquidating the soft tissue and muscles therein; causing severe, PERMANENT and disabling injuries as hereinafter more specifically alleged and

3

stated. That the said subject Kahr pistol had not been modified nor changed since the time of the purchase of said Kahr pistol.

7.     That the Defendant was in the business of designing, manufacturing, assembling, and/or selling Kahr pistols and more specifically the above described Kahr pistol. That the said Kahr pistol was supplied by the Defendant in a DEFECTIVE condition which rendered said Kahr pistol UNREASONABLY DANGEROUS and further that the said DEFECTIVE conditions in said Kahr pistol were a proximate cause of the PERMANENT injuries and damages to the Plaintiffs as hereinafter more specifically alleged. That said Kahr pistol was DEFECTIVE and UNREASONABLY DANGEROUS at the time of the gunshot injury on December 24, 2018, and at the time said Kahr pistol left the possession of the Defendant; and that said defects in said Kahr pistol were a proximate cause of the PERMANENT injuries and damages to the Plaintiffs, as hereinafter more specifically alleged. Said Kahr pistol was DEFECTIVE in one or more of the following particulars, to-wit:

a.     said Kahr pistol did not operate as represented in the instructional manual and other publications and statements by the Defendant with reference to the fact that said Kahr pistol, as herein-above described and as occurred at the time of

4

the accident, WOULD FIRE AND DISCHARGE A ROUND WITHOUT ANY TRIGGER PULL;

b.      said Kahr pistol did not have adequate safety devices designed and built into said pistol, such as a TRANSFER BAR, that would prevent a DROP FIRE accident;

c.      said Kahr pistol fired and discharged a round WITHOUT A TRIGGER PULL;

d.      said Kahr pistol did not have adequate warnings and an adequate warning statement on the frame or slide of said pistol;

e.      said Kahr pistol failed to perform as safely as an ordinary consumer (and owner and user of the pistol at the time of the accident) would expect said pistol to perform when used in an intended or reasonably foreseeable manner;

f.      that said Kahr pistol fired and discharged a round as a result of a DROP FIRE;

g.      that the use for which the Kahr pistol in this case was being used, at the time of the accident, was being used in a reasonably foreseeable manner;

h.      that when all factors are considered with reference to the design, manufacture and distribution of the subject Kahr pistol, the benefits of such design

5

of said Kahr pistol do not outweigh the risk of the dangers inherent in such a Kahr pistol which will DROP FIRE;

i.      that said Kahr pistol was defective and unreasonably dangerous, and did not perform in accordance with the representations made by the Defendant in the INSTRUCTIONAL MANUAL for said Kahr pistol, and as represented in other places where said Defendant made a representation about the proposition that said Kahr pistol would not fire and discharge a round by DROP FIRE and/or without an intentional trigger pull;

j.      THAT THE FOLLOWING ARE PLACES AND INSTANCES WHERE THE DEFENDANT MADE FALSE REPRESENTATIONS AND STATEMENTS ABOUT THE SAFETY OF THE KAHR PISTOL:

(1)   Patent No. 5,502,914, by inventor Kook-Jin Moon, has language which in effect states that the Kahr pistol will not "DROP FIRE and/or fire WITHOUT A TRIGGER PULL; and specifically from Patent 5,502,914, page 9 under Item 4, subparagraph 20, in a description of the patent there is the statement as follows:

> The vertical alignment of the first cam lobe **22** with the pivotal axis of the cam in its first position provides an important safety feature, because the angular movement of the cam (over 60°) which is required to move the striker to and release it in its fully-cocked position IS TOO GREAT A MOVEMENT TO RESULT FROM DROPPING THE GUN.   (emphasis added)

6

Obviously in this case there was not a TRIGGER PULL.   Also, under Item 4,

subparagraph 35, there is the following:

> A LONG TRIGGER PULL IS REQUIRED to produce the
> necessary angular displacement of the cocking and releasing cam
> (over 60°) necessary to move the striker from its half-cocked to
> its fully cocked and releasing position.   During this cam
> movement the first cam lobe **22** moves both in vertical and
> horizontal directions as the cam travels along its rotational arc to
> move the cocking cam from its half-cocked to its fully-cocked
> and released positions against the biasing force of the spring **28**.
> THE AFORE-DESCRIPBED FEATURES RESULT IN AN
> INHERENTLY SAFE FIRING MECHANISM. (emphasis
> added)

The last sentence in the above quote is so extremely important to show the

many places where Defendant has made a very important FALSE

REPRESENTATION about the subject Kahr pistol, that it must be repeated

again.   THE   AFORE-DESCRIPBED   FEATURES   RESULT   IN   AN

INHERENTLY SAFE FIRING MECHANISM.   Obviously there was not

any LONG TRIGGER PULL with reference to the DROP FIRE of the Kahr

pistol in this case.   Defendant has taken the position that the discharge of the

Kahr pistol on December 24, 2018, was not a DROP FIRE.   The subject Kahr

pistol was designed and manufactured pursuant to the terms and provisions of

Defendant's Patent No. 5,502,914, which is stated above, and the two

emphasized sentences, to-wit:

7

> A long trigger pull is required…
>
> The afore-described feature results in an inherently safe firing mechanism.

There was not a person on the floor where the Kahr pistol hit the floor to have pulled the trigger because as the Kahr pistol hit the floor it discharged. It is an extremely false representation of the Kahr pistol that it will not DROP FIRE and the Defendant is going to extreme bad faith conduct in stating that it was not a DROP FIRE to cause the Kahr pistol to discharge when it hit the floor. Certainly such conduct warrants PUNITIVE DAMAGES.

(2) In the patent infringement lawsuit filed in the U.S. District Court for the Middle District of Florida, Orlando Division, *Saeilo, Inc., d/b/a Kahr Arms v. Diamondback Firearms, LLC*, Case No. 6:12-cv-00793, Plaintiff, Saeilo, Inc., d/b/a Kahr Arms (named exactly as stated herein-above), made the following allegation and statement in Paragraph 5 of the Complaint, as follows:

> The rotating motion of the cam mechanism results in a smoother trigger pull than in hammer cocking and transfer bar firearms. The cam firing mechanism also results in less wear with use than known firearms due to greater steel-on-steel surface contact. Because the weapon can only discharge via the cam initiated release at the full-cocked position, THE DISENGAGEMENT OF THE CAM AND STRIKER ALSO OFFERS A UNIQUE SAFETY ELEMENT IN THAT THE WEAPON CANNOT BE

FIRED WITHOUT PULLING THE TRIGGER. (emphasis added)

Certainly PUNITIVE DAMAGES are applicable in a situation where a defendant has made so many FALSE REPRESENTATIONS as was/is being made by the Defendant in this case. The statement that "WEAPON CANNOT BE FIRED WITHOUT PULLING THE TRIGGER" is false because obviously in this case no one pulled the trigger. The Kahr pistol DROP FIRED! There must be a reason why Defendant would take the position that there was not a DROP FIRE accident in this case when the Kahr pistol hit the floor with all of the strong statements about the safety of the Kahr pistol and how the Kahr pistol requires a "long trigger pull."

(3) There are six places in the OPERATING INSTRUCTIONS for the series CT, CW & CM models language to the effect that Kahr pistols will not discharge on a "DROP FIRE" as follows:

### FIRST TIME

Page 3     The KAHR Pistol trigger system allows the shooter to quickly bring the pistol into action. The striker is automatically held under partial tension after each round and is fully secured by a passive striker block UNTIL THE TRIGGER IS FULLY DEPRESSED. (emphasis added)

Obviously the last sentence in the above is FALSE because in the present case the trigger was not fully depressed.

9

## SECOND TIME

Page 5        The KAHR Pistol has several design features and
internal mechanical safeties DESIGNED TO PREVENT
ACCIDENTAL DISCHARGES IN THE EVENT THAT THE
PISTOL IS DROPPED or receives a severe blow. (emphasis
added)

It is obviously a FALSE STATAEMENT when the Defendant states that the

Kahr pistol has several design features to prevent a DROP FIRE when there is

such strong and obvious evidence in this case that there was a DROP FIRE.

## THIRD TIME

Page 7        The    KAHR    Pistol    has    several    DESIGN
FEATURES AND INTERNAL MECHANICAL SAFETIES
DESIGNED TO PREVENT ACCIDENTAL DISCHARGES IN
THE EVENT THAT THE PISTOL IS DROPPED or receives a
severe blow.  (emphasis added)

Obviously the above is a FALSE STATEMENT because in the present case

there is strong evidence that the pistol was dropped and not any actual

evidence to prove that the pistol was not dropped which caused the discharge.

## FOURTH TIME

Page 9        The KAHR Pistol has several design features and
internal mechanical SAFETIES DESIGNED TO PREVENT
ACCIDENTAL DISCHARGES IN THE EVENT THAT THE
PISTOL IS DROPPED or receives a severe blow. (emphasis
added)

Where were the "safeties" mentioned above when the pistol was dropped in

10

the present case?   Where are the "several design features?"   And why didn't

those "several design features" prevent the DROP FIRE in this case?

### FIFTH TIME

> Page 11      The KAHR Pistol has several design features and
> internal   mechanical   safeties   designed   to   PREVENT
> ACCIDENTAL DISCHARGES IN THE EVENT THAT THE
> PISTOL IS DROPPED or receives a severe blow. (emphasis
> added)

Note that what is stated at page 11 is exactly what is stated in other

representations made by Defendant.   Defendant must think that if Defendant

makes the same FALSE STATEMENTS "over and over" that said FALSE

STATEMENTS will then become true.

### SIXTH TIME

> Page 13      The KAHR Pistol has several design features and
> internal   mechanical   safeties   DESIGNED   TO   PREVENT
> ACCIDENTAL DISCHARGES IN THE EVENT THAT THE
> PISTOL IS DROPPED or receives a severe blow. (emphasis
> added)

Again, the same statement.   Obviously, all of these FALSE STATEMENTS

certainly show and prove that PUNITIVE DAMAGES are applicable to this

situation.

That said defects in said Kahr pistol, acting both singularly and/or in combination

each with the other, were a proximate cause of the PERMANENT injuries and

11

damages of the Plaintiffs as hereinafter more specifically alleged.

8.    Plaintiffs allege the following FACTS that the accident, as described herein, was caused by a DROP FIRE of the afore-described Kahr pistol, as follows:

a.    A police officer examined the scene and took pictures before anyone "touched or moved" anything at the accident scene.   The police officer observed a chip in the tile floor caused by the DROP FIRE accidental discharge and also observed that the SPENT CARTRIDGE WAS STILL IN THE SIDE OF THE FIREARM.   The investigating police officer was definitely of the opinion that the accidental discharge was caused by a DROP FIRE of the subject Kahr pistol because during the DROP FIRE, the slide was not in a position and/or did not have the force to eject the spent cartridge, and after the DROP FIRE discharge, the spent cartridge was still in the side of the firearm.   (This absolutely means that it was a DROP FIRE in this case.)

b.    A drawing and specific description of the accident is attached hereto as Exhibit B, which shows, *inter alia*, the location of the chip in the floor, the path of the discharged bullet, and the entry and exit wound in plaintiff's left leg, with specific measurement descriptions as follows:

As of 06/25/20 Circumference of right thigh – 22 inches

As of 06/25/20 Circumference of left thigh (injured) – 21 inches

12

From bullet hole in wall to chip in floor – 60 inches

From bullet hole in wall straight down to floor – 47 inches

From wall that has bullet hole to chip (along floor) – 36

From entrance wound on thigh to floor – 2 feet

From exit wound on thigh to floor – 2 feet 6 inches

From entrance wound to exit wound across thigh – 8 inches

This shows conclusively that the subject pistol DROPPED, hit and caused a chip in the floor, and then traveled through the left leg of plaintiff.

c.      Said Kahr pistol, at the time of the DROP FIRE, was in a holster and the DROP FIRE blew out the end of the holster.  A photograph of said holster is attached hereto as Exhibit C.

9.      As further reference and proof to the many times that Defendant has printed and made the statement that the Kahr pistol will not fire and discharge a round on a DROP FIRE and/or without a trigger pull, is the fact that:

a.      Defendant must, as a gun manufacturer, must fill out ATF Form 5300.11 (sample attached hereto as Exhibit D) and advise the U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, of the exact number of firearms manufactured and sold or distributed into the United States commerce, and in connection with the sale and distribution of each such firearm, Defendant provides an instructional manual, as herein-above stated;

13

b.      the total number of firearms manufactured by Defendant and reported on said ATF Form 5300.11 for the stated years are as follows:

(1)   2015 – 25,444

(2)   2016 – 40,274

(3)   2017 – 23,546

making the average Kahr firearms sold and distributed as 29,754 firearms per year; and concerning each instructional manual published for each of said firearms; and considering there are SIX PLACES in the instructional manual which states in effect that the Kahr firearm will not discharge when dropped; there would be 89,262 times that published instructional manuals for Kahr firearms contained the FALSE REPRESENTATION that a Kahr firearm will not discharge when dropped.

10.     That the Defendant did breach an IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE; that Plaintiffs were persons whom the Defendant would and should have reasonably expected to use the said Kahr pistol which is the subject of this litigation; that at the time of manufacture and sale of said Kahr pistol by the Defendant, the Defendant had reason to know the particular purposes for which said Kahr pistol would be used and the Defendant knew that the Plaintiffs would be relying upon the skill and judgment of the Defendant to select and use suitable materials in the design, inspection,

14

manufacture, sale and/or distribution of said Kahr pistol; that Defendant failed to use proper skill and judgment in the design, manufacture, assembly, sale and/or distribution of said Kahr pistol which caused said Kahr pistol to be UNFIT FOR A PARTICULAR PURPOSE, that is, the purpose for which said Kahr pistol was being used at the time of the accident as alleged herein; and that the breach of said IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE was a proximate cause of the injuries and damages to the Plaintiffs as hereinafter more specifically alleged.

11.    That the Defendant did manufacture, sell and distribute the afore-described Kahr pistol, and at the time of the accident in this case said Kahr pistol was in an UNMERCHANTABLE CONDITION and that the Plaintiffs were persons who might reasonably be expected to use said Kahr pistol and be affected by said UNMERCHANTABLE CONDITION; and the breach of said UNMERCHANTABLE CONDITION was a proximate cause of the PERMANENT injuries and damages to Plaintiffs as more specifically alleged herein.

12.    That the Defendant was engaged in the business of selling products, that is, firearms, and more specifically the Kahr pistol that is the subject of this litigation; and that the Defendant did by advertising, labels, statements and/or otherwise make to the public and to Plaintiffs in this case EXPRESS

15

WARRANTIES concerning the character and/or quality of said Kahr pistol which was manufactured, advertised and sold by the Defendant; that said Kahr pistol did not conform to the EXPRESS WARRANTIES of character and/or quality as created and represented by the Defendant, and that the failure of the Kahr pistol, which is the subject of this litigation, to conform to the EXPRESS WARRANTIES concerning character and/or quality of said Kahr pistol were a proximate cause of the injuries and damages to the Plaintiffs as hereinafter more specifically alleged.

13.    That the Plaintiffs did give notice of said breach of warranties to the Defendant, as is provided in A.C.A. § 4-2-607(3)(a). (Copy of notice attached hereto as Exhibit E)

14.    That the Defendant, as a manufacturer with reference to Kahr pistols and specifically the Kahr pistol as described herein, had a duty to give a REASONABLE AND ADEQUATE WARRNING of dangers inherent and/or reasonably foreseeable in the use of said Kahr pistol, and the said Defendant failed said duty and failed to give ADEQUATAE WARNINGS; and the failure to give said ADEQUATE WARNINGS was a proximate cause of the PERMANENT injuries and damages to the Plaintiffs as hereinafter more specifically alleged.

15.    That the Defendant, as a manufacturer with reference to Kahr firearms and specifically the Kahr pistol as described herein, had a duty to give

16

REASONABLE AND ADEQUATE INSTRUCTIONS with respect to the conditions and methods for the safe use of said Kahr pistol when said Kahr pistol was used in a reasonably foreseeable manner, and the Defendant failed to give said reasonable and adequate instructions (to include a specific warning that the said subject Kahr firearm would DROP FIRE) which was a proximate cause of the PERMANENT injuries and damages to the Plaintiffs as hereinafter more specifically alleged.

16.    That the circumstances of the accident in this case as described herein are such that the accidental discharge of the said subject Kahr pistol would not have occurred in the absence of a defect; therefore, based upon CIRCUMSTANTIAL EVIDENCE as to how the accident occurred, the said subject Kahr pistol was defective, which was a proximate cause of the PERMANENT injuries and damages to the Plaintiffs as hereinafter more specifically alleged.

17.    Defendant has knowledge of DROP FIRE ACCIDENTS involving a Kahr pistol as follows:

### STREETER

a.    In Streeter v. Saeilo, Inc., d/b/a Kahr Arms, U.S. District Court for the District of Nebraska, Lincoln Division, Case No. 4:18-CV-03077, the allegations

concern a Kahr CT 45 pistol, serial number AKA2216, and the description of the

DROP FIRE is at page 2, Paragraph 6, as follows:

> That on 10/08/2015, Plaintiff exited from his parked vehicle in his
> driveway located at 504 Broadway St., Holdrege, Phelps County,
> Nebraska, when said Kahr CT 45 pistol fell out of his holster, hitting
> the ground, discharging or firing, resulting in entrance and exit wound
> to his left lower leg and shattering of his tibia, resulting in permanent
> scarring, disability and damages for which he is entitled.

Streeter in his Amended Complaint also alleges in Paragraph 7 that the Kahr CT 45

pistol was:

> …unreasonably dangerous for its reasonably foreseeable uses, because
> of the following design and manufacturing defects and causing
> permanent injury, including:
>
> A.    A defectively designed firing pin block spring; and
>
> B.    An overpowered firing pin block spring.

Streeter also alleges in Paragraph 8 of the Amended Complaint the following:

> C.    Defendant knew, or in the exercise of ordinary care, should have
> known the firing pin block of the Kahr CT 45 pistol failed to fully
> engage, which would result in the pistol discharging upon being
> dropped.
>
> D.    Defendant was negligent in the fitment of parts including the
> firing pin block of the Kahr CT 45 pistol.

JOY

18

b.   In <u>Damian Joy v. Saeilo, Inc., d/b/a Kahr Arms, et al</u>, Circuit Court of

Palm Beach, Florida, Case No. 2019-CA-013062, the allegations in the Complaint

concern a Kahr Arms PM 9, bearing serial number 1B3397, and a description of the

DROP FIRE is at page 4, as follows:

15.   On or about February 15, 2016, DR. JOY placed THE
FIREARM on top of some books/papers located a (sic) desk located in
the Plaintiffs home at 15199 Temple Boulevard, Loxahatchee, Palm
Beach County, Florida 33470.

16.   On or about February 15, 2016, THE FIREARM fell onto the
floor and unintentionally discharged and/or drop fired, without the
trigger being pulled, causing a bullet to exit THE FIREARM and strike
DR. JOY in his left leg.

## HEIKKILA

c.   In <u>John Heikkila v. Kahr Firearms Group</u>, District Court of El Paso

County, Colorado, Case No. 2020CV31411, the allegations in the Complaint

concern a Kahr Arms PM4543N and a description of the DROP FIRE is at page 2 as

follows:

10.   On August 12, 2018, Plaintiff was in a restroom at the Cinemark
movie theatres in Colorado Springs, Colorado and was open carrying
the weapon in question, which was secured in a Blackhawk holster.
While in the restroom the weapon fell out of its holster and landed on a
tile floor on the rear slide of the weapon.   Upon being dropped on the
floor the weapon spontaneously discharged and a bullet struck Plaintiff
in his abdomen, 1 inch to left of his belly button.   The bullet came to
rest under his left rib where it remains.

(Plaintiffs' allegations with reference to the facts of the DROP FIRE in the Finney case are stated in Paragraph 6 above.)

18.    In all four cases (Finney, Streeter, Joy, and Heikkila) the basic facts of the DROP FIRE are the same.   The Kahr pistol drops, hits the floor, and there is a DROP FIRE causing injuries to the above named four plaintiffs; and in all four situations the defendant states and alleges that the said Kahr pistol "passed the California drop fire test."   There are probably many other drop fire situations of a Kahr pistol that "passed the California drop fire test."   It is obviously shown and proven by the above statements and comments that the "California drop fire test" certainly does not prevent the Kahr pistol from discharging a round in a drop fire situation.   In all situations where a complaint has been filed against the Defendant, and the Defendant makes the contention that the Kahr pistol passed the California drop fire test, the Defendant has not file a third party action against the State of California.   Based on the above uncontroverted FACTS of the drop fire in each of the above situations, that Defendant knew or ought to have known, in the light of the surrounding circumstances, that Defendant's conduct in continuing to rely upon the California drop test would naturally and probably result in additional drop fire injuries; and the Defendant should not have continued such conduct by relying on the California drop fire test, which such conduct was continued "with reckless

20

disregard of the consequences from which malice may be inferred;" for which PUNITIVE DAMAGES should be awarded.

19.    That as a proximate result of the negligence of the Defendant, breach of implied and express warranties, defective Kahr pistol, and all other legal theories as alleged against the Defendant, the Plaintiff, Charles P. Finney, received injuries and damages as follows:

a.    medical expenses, past and future;

b.    pain and suffering, past and future;

c.    loss of income in the past and loss of income in the future;

d.    permanent loss of decreased earning capacity;

e.    loss of ability to properly walk, play sports, and enjoy life; and

f.    permanent scarring, disfigurement and permanent partial disability as a result of said injuries.

20.    Plaintiff is employed in the military service and has sustained damages, in connection with said employment, as follows:

a.    Mr. Finney will have to undergo early discharge from the Arkansas Army National Guard. He is looking at a loss of Guard pay in an amount in excess of $193,000.00 and an additional loss of insurance in an amount in excess of $60,000.00 will result in that regard. Mr. Finney has accumulated sick leave,

21

which he will have to forfeit, in an amount in excess of $2,000.00.   He has GI Bill available in an amount in excess of $20,000.00, that will be forfeited. Additionally, he suffered medical expenses in excess of $12,000.00.   Thus, his total losses on economic damages will exceed an amount in excess of $300,000.00.

   b.   Mr. Finney, who is forty-nine (49) years of age, planned on staying in the Arkansas Army National Guard until mandatory retirement of sixty (60) years of age.   As a result of the injuries received in the accident as alleged herein, Mr. Finney is not able to pass the periodic physical tests for which he has now been discharged.   As a result, Mr. Finney will incur a loss of drill pay, annual training, and basic housing allowance pay.   Additionally, he will lose his coverage with Tricare health insurance and have to pick up another insurance policy, with higher premiums.   Thus, the total economic damages that Mr. Finney has suffered is in excess of $300,000.00.

   c.   Plaintiffs have suffered pain, mental anguish, and loss of services, companionship, and consortium, each to the other.   Mr. Finney was a decorated soldier who enjoyed serving his country and the permanent physical disability to Mr. Finney will cause much mental anguish.

   d.   Charles P. Finney is the proverbial "tough guy," and keeps a stiff upper lip.   However, he is injured and after serving our country in a deployment, and as

an Army Chaplain, consulting numerous soldiers with post-traumatic stress disorder, it is clear that he suffers from the same, due to this injury. This injury was not Charles P. Finney's fault; however, his life, and the life of his wife, Stephanie Finney, have been changed as a result of the PERMANENT physical injuries to Mr. Finney.

21.     That as a proximate result of the negligence of the Defendant, breach of implied and express warranties, defective Kahr pistol, and all other legal theories as against the Defendant, the Plaintiffs, Charles P. Finney and Stephanie Finney, received injuries and damages as hereinabove stated, and for loss of companionship, services and consortium each with the other.

22.     Plaintiffs, Charles P. Finney and Stephanie Finney, based on all of the mental and physical damages suffered in the past and to be suffered for the rest of their lives, have each sustained and will sustain damages in excess of $10,000,000.00.

### Punitive Damages

23.     In addition to compensatory damages, as alleged herein, Plaintiffs allege and ask for PUNITIVE DAMAGES, which may be, and in this case should be, imposed on Defendant to punish the Defendant and to deter the Defendant and others from similar conduct.  Allegations herein and the opinions of Jack Belk in

his report attached hereto as Exhibit F, support Plaintiffs' claims and allegations for PUNITIVE DAMAGES which should be imposed. Plaintiffs state that the allegations made herein support this claim for PUNITIVE DAMAGES by clear and convincing evidence.

24. Plaintiffs make the following allegations which will further prove and emphasize all of the above allegations with reference to the subject defective and unreasonably dangerous Kahr pistol. Further, Plaintiffs allege all of the hereinafter elements necessary to prove PUNITIVE DAMAGES based upon the continued years of the Defendant's manufacturing, selling and distributing the defective and unreasonably dangerous Kahr pistol. Plaintiffs allege PUNITIVE DAMAGES as follows.

25. Plaintiffs allege that the Defendant knew, or ought to have known, in the light of surrounding circumstances, that Defendant's conduct would naturally and probably result in injury or death in connection with the manufacture, sale and distribution of the unreasonably dangerous Kahr pistol; and that Defendant continued such conduct in reckless disregard of the consequences from which malice may be inferred.

**Review, Analysis And Opinion By Jack Belk**
**Concerning The Kahr CW-40**

24

26.    As further allegations pled herein Plaintiffs attach hereto as Exhibit F,

and made a part of this Complaint, a report by Jack Belk (including his Resume,

Case Listing, and Publications) concerning his analysis and opinions with reference

to two Kahr CW-40 pistols, and other acts of Defendant, all of which support

Plaintiffs' allegations of PUNITIVE DAMAGES as against the Defendant.    The

report, obviously, gives opinions with reference to the very defective and

unreasonably dangerous CW-40; therefore, Plaintiffs quote the following from Jack

Belk's report:

> EVIDENCE OF 'DROP FIRE' – Both cases indicated without doubt
> the gun fired while still in the holster.
>
> THE SAFETY – …but there is no doubt these guns can fire by
> dropping, so how does it do it? *** It takes less than ten ounces of
> pressure to dislocate the firing pin-striker blocker safety by only .032"
> (1/32) at which point it is disengaged. *** Given the weak return spring
> which determines the location of the safety, the extremely small and
> roughly shaped safety surface of uncertain heat-treat, and the strength
> and velocity of the firing pin-striker from the nearly full cocked
> position, the firing pin block safety is not safe in practical application
> and makes the CW-40 pistol unduly dangerous to carry in a loaded
> condition.
>
> THE SEAR-STRIKER RELATIONSHIP – The gun is about three
> quarters cocked anytime the slide is closed.
>
> EVIDENCE OF FIRING AT IMPACT – In addition to two
> eyewitnesses, a dent in the floor, a blown out holster, a fired case still in
> the chamber and the upward trajectory of the bullet, one fired case
> showed a unique firing pin mark that indicates a firing of the pistol
> other than by pulling the trigger. *** The firing pin mark shows the

slide 'bounced' and left a dual round mark instead of the normal finger flick smear. The firing pin mark is clear indication of a gun that fired with the slide hard against a hard surface and could not have been held by hand.

CONCLUSION OF THE EVENT – It is abundantly clear the CW-40 pistol fired when it hit a hard floor. It left a mark. The end of the holster was blown out. The case was still in the chamber. The primer was marked much differently than a hand fired case. The bullet path was clearly upward at an angle and bullet came to rest where it would be expected in a nearby wall after penetration of the victim.

EXPLANATION OF THE EVENT – The gun was loaded in chamber and accidentally dropped on a floor. Even though a passive safe design was present, this safety was over-ridden or non-operational and was defeated by gravity and inertia. In addition and at the same time, the engagement between the sear and the firing pin-striker was lost allowing the gun to fire. The energy to displace the parts came from gravity. The energy to fire the gun was already present because with the slide at rest it is approximately 72% in the cocked condition.

SUMMATION – *** The fact that at least two of the guns have drop fired, it's safe to 'catalog' this gun design as one meant to be safe but proved to be insufficiently safe when applied to a firearm. *** Those guns are not safe to have a live cartridge in line with the firing pin. (emphasis added)

SAFETY TEST AND REALITY – *** The Kahr CW-40 can fire when dropped and evidence shows they have in fact fired when accidentally dropped from about waist high onto a hard surface. Serious injury or death can result from such uncontrolled firing of a deadly weapon.

There are no warnings or recalls listed on the internet and local shops have not been notified of the defect as of this date (11-11-21).

CONCLUSIONS – The Kahr CW-40 is by definition unduly dangerous due to it firing without pulling the trigger. From examination of exemplars, it is clear the only safety device installed is deficient and

does not interpose itself effectively to prevent firing should the sear-striker interface fail under impact.

The examination explains to a high degree of mechanical certainty that the gun is unduly dangerous to carry in the normal (loaded) condition and is a constant danger to the shooter/carrier and by-standers because the design and construction of the gun does not render it safe against a simple fall from modest height…
*** At the very least, a warning should be made to owners, dealers, repair shops, national publications and internet repositories of firearms warnings and recalls.   These guns can, and have, fired when dropped and have already caused serious personal injuries.

27.   If some company, during the last 100 years, wanted to design, manufacture and sell a very safe single action or double action revolver, they could just copy the design in the Iver Johnson revolver which basically outlines, in Patent No. 505,918 dated October 8, 1893, a method to make the revolver ABSOLUTLEY SAFE from any bump, blow, force, or the hammer as against the firing pin because the basic design includes a small piece of metal at the top of the hammer which, when the hammer is full forward, prevents the hammer from moving full forward and always "leaves a space" behind the loaded cartridge and therefore a drop fire or other blow to the hammer just hits the hammer that has in front of it a "open space." When the user pulls the trigger there is a TRANSFER BAR which leads upward, as the trigger is pulled, and fills in the gap.

a.   Attached as Exhibit I is an advertisement concerning the Iver Johnson revolver showing a person with one hand holding the revolver and the other hand

27

holding a hammer that was hitting the hammer on the revolver.  This famous advertisement of the Iver Johnson revolver was called "HAMMER THE HAMMER."

b.      Further, as depicted in Exhibit J, the Iver Johnson revolver was advertised by depicting a drawing of the revolver showing a gap in front of the hammer and the transfer bar lowered and ready to fill in the space.  The statement below the drawing of the revolver was as follows:   "2,000,000 of These Revolvers Now in Use and not a Single Accident."

c.      Sixteen years after the date of the Iver Johnson patent anyone in the world, without consent or payment to anyone, could have copied, produced and sold a revolver containing the Iver Johnson transfer bar, which has been proven to totally eliminate any drop fire of a firearm.

d.      The Iver Johnson transfer bar safety has now been placed and used in many single and double action revolvers.

e.      Obviously, the popularity of the Iver Johnson "Hammer the Hammer" is known by all individuals who have any dealings with firearms; and obviously Defendant would have known about the Iver Johnson revolver with the transfer bar because it is of such notoriety; and further because of the fact that in June, 2010,

Defendant purchased Magnum Research, and Magnum Research has a caliber 454 revolver that incorporates the Iver Johnson transfer bar.

f.     There exists a "salesman's sample" of an Iver Johnson revolver which does not have a side on the revolver; and therefore when the trigger is pulled one can observe the transfer bar going up and "filling in the gap" in front of the trigger.

28.     Attached as Exhibit G is an article by Rocco Parascandola entitled "NYPD POLICE DEPARTMENT BRASS TO COPS: STOP USING KAHR K-9 SEMI-AUTOMATIC PISTOL AS AN OFF-DUTY GUN," published by the New York Daily News dated December 12, 2011.   Some of the comments in connection with said article included the following:

a.     the author reports that Kahr Arms had done business with the NYPD since 1997, and had sold more than 4,000 Kahr pistols to the city police. (Obviously the NYPD had a very extensive knowledge of the Kahr pistol and that is the reason that the NYPD ordered the police to stop using the Kahr pistol as an off-duty gun.

b.     Frank Harris, an employee and spokesman for Kahr Arms, denied that the pistol discharges when it is dropped and blamed any accidental shooting on user error.   It appears that Kahr continues to use the same argument today, in this case, as was made more than ten years ago, that is, that any "drop fire" of a Kahr firearm is

caused by user error. (Kahr firearms are to be designed and developed for contemplated use and courts have held that the "contemplated use" of a firearm includes that the firearm will be dropped.)

    c.    The NYPD wanted the trigger pull weight increased from 7 ½ pounds to 13 pounds in order to make the trigger pressure similar to the Glock pistol (all police officers use a Glock pistol), but Harris stated that Kahr had tried for three years to increase the trigger pull pressure on the Kahr pistol but could not increase the pressure as requested by the NYPD.

    d.    It is obvious that the NYPD could not tolerate the accidental discharges of the Kahr pistol. Note the following comment by Rocco Parascandola which was probably the main reason for the direction to not use the Kahr pistol as an off-duty gun:

> Overall, there were 21 accidental discharges last year, only six of which took place during a confrontation with a suspect, according to the NYPD.

> In 2009, eight of the 23 accidental shootings involved a confrontation with a suspect.

29.    It is unbelievable that Defendant could deny that a discharge of the Kahr pistol, in this the Finney case, was caused by a DROP FIRE because note the following uncontested FACTS:

    a.    The dent in the tile floor where the pistol dropped.

b.    The drawing, attached hereto as Exhibit B, shows that there was an immediate upward motion of the travelling 60 inches and lodging in the wall, 47 inches above the floor at that point.    The photograph of the entry and exit wounds in the left leg of Charles Finney (Exhibit A) shows that the bullet, as discharged from the firearm, went directly in an upward motion.    There obviously was not any trigger pull which caused the discharge of the firearm.

c.    The FACT that the fired cartridge had not been ejected and was still in the Kahr pistol, as said pistol was on the floor after the discharge, is absolute evidence of a DROP FIRE.    The police officer who investigated the accident was in the room within one or two hours subsequent to the discharge, and no one else had been in the room at the time he made his observations and photographs.    Attached as Exhibit H is a photograph taken by the police officer after the DROP FIRE discharge of the Kahr pistol which shows the spent cartridge in the side of the firearm.

d.    Said Kahr pistol, at the time of the DROP FIRE, was in a holster and the DROP FIRE blew out the end of the holster.    A photograph of said holster is attached hereto as Exhibit C.    It would be impossible for a person's hand to be in the holster so as to have the "long trigger pull."    (Note that Patent No. 5,502,914 by inventor Kook-Jin Moon states under Item 4, subparagraph 35, that the design

31

requires a "long trigger pull.")

30.     It is unbelievable, with all of the absolute and uncontroverted FACTS

that the Kahr pistol discharged as a result of a DROP FRIE, that Defendant would

deny that the pistol discharged as a result of a DROP FIRE on the contention that the

Kahr pistol passed the California drop fire test some years prior to the DROP FIRE.

31.     Plaintiffs have alleged many facts to support PUNITIVE DAMAGES

which include, *inter alia*, more than 15 places with reference to certain descriptions

as to how the Kahr pistol is designed to operate, which said representations are

totally and absolutely false.   Also, a reason for PUNITIVE DAMAGES is the fact

that Plaintiffs have shown herein the "strongest possible case" of a DROP FIRE in

this case and a DROP FIRE creates an extremely dangerous situation and could

certainly result in serious injury and death.   Further, Jack Belk has extensive

knowledge as to the design of firearms and, of course, DROP FIRE accidents.   Jack

Belk has been involved in one case where a DROP FIRE accident caused the death

of an individual; and stated in his report, attached hereto as Exhibit F, that "[S]erious

injury or death can result from such uncontrolled firing of a deadly weapon."   Also,

to show and prove the extremely dangerous characteristics of the Kahr pistol, is the

fact that the NYPD terminated the use of the Kahr pistol (which had been used for

over ten years) as an off-duty gun for New York City police officers.   Plaintiffs

have alleged substantial evidence to support PUNITIVE DAMAGES.

WHEREFORE, the Plaintiffs, Charles P. Finney and Stephanie Finney, pray that each Plaintiff do have and recover judgment for and against the Defendant, Saeilo, Inc., d/b/a Kahr Arms, for compensatory damages in a reasonable and just amount, for each element of damages as alleged herein, all in excess of $10,000,000.00, exclusive of interest and costs; further, Plaintiffs Charles P. Finney and Stephanie Finney, pray that Plaintiffs do have and recover judgment for and against the Defendant, Saeilo, Inc., d/b/a Kahr Arms, for PUNITIVE DAMAGES in a reasonable and just amount, in excess of $10,000,000.00, exclusive of interest and costs; and for all other relief deemed proper and just.

David P. Price
Law Office of David P. Price, P.A.
P.O. Box 765
Magnolia, AR   71754
870-234-4781
office@dpplaw.com

E. C. Gilbreath
Gilbreath Law Firm
P.O. Box 1268
Fort Smith, AR   72902
479-806-6027
attysatlaw@aol.com

By: _____
E. C. Gilbreath, ABA 63017

33

# EXHIBIT A



# EXHIBIT B

## CHARLES PATRICK FINNEY

**MEASUREMENTS:**

As of 06/25/20  Circumference of right thigh = 22 inches

As of 06/25/20  Circumference of left thigh (injured)= 21 inches

From bullet hole in wall to chip in floor= 60 inches

From bullet hole in wall straight down to floor = 47 inches

From wall that has bullet hole to chip (along floor) = 36

From entrance wound on thigh to floor = 2 feet

From exit wound on thigh to floor = 2 feet 6 inches

From entrance wound to exit wound across thigh = 8 inches



# EXHIBIT C



# EXHIBIT D

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

OMB No. 140-0012 (07/31/2020)

# Annual Firearms Manufacturing and Exportation Report (AFMER) Under 18 U.S.C. Chapter 44, Firearms

**NOTE:** This report **MUST** be filed even if no firearms were exported or distributed into commerce. Please read the Instruction Sheet before completing this form.

☐ Original Annual Report - Calendar Year Ending December 31, _____ *(fill out year)*   ☐ Out of Business Final Report   ☐ Amended Report - Year _____ *(fill out year)*

| | |
|---|---|
| 1. Name of Licensee: | 2. Trade Name *(If any):* |
| 3. Federal Firearms License Number: | 4. Employer Identification Number (EIN): |
| 5. Address *(Number, Street, City, State, ZIP Code):* | 6. Mailing Address *(If different than item 5):* |
| 7. If Business has Been Discontinued: _____ *(Date of Discontinuance)* | **Note:** Even if you've discontinued business, you are still required to complete this form if you were in business for 1 or more days during the previous calendar year. |

## FIREARMS PRODUCED AND SOLD OR DISTRIBUTED INTO UNITED STATES (U.S.) COMMERCE - EVEN IF NO MONETARY VALUE RECEIVED

8. Number of firearms by type (See definition #5) that were **SOLD or DISTRIBUTED INTO U.S. COMMERCE** during the reported calendar year you listed above (even if produced in a previous year). **Fill in all totals for items 8a-j. Enter "0" (zero) if no firearm was distributed into commerce** (See definition #2).

| | | Number of Firearms Distributed into Commerce Pistols and Revolvers by Caliber | | | | | |
|---|---|---|---|---|---|---|---|
| Type of Firearm Distributed into Commerce | Up to .22 | Up to .25 | Up to .32 | Up to .380 | Up to 9MM PARA. | Up to .50 | **Total** Distributed into Commerce |
| a. Pistols | | + | + | + | + | + | = |
| | Up to .22 | Up to .32 | Up to .38 SPEC. | Up to .357 MAG. | Up to .44 MAG. | Up to .50 | |
| b. Revolvers | | + | + | + | + | + | = |

| Type of Firearm Distributed into Commerce | **Total** Distributed into Commerce | Type of Firearm Distributed into Commerce | **Total** Distributed into Commerce |
|---|---|---|---|
| c. Rifles | | h. Short-Barreled Shotguns | |
| d. Shotguns and Combination Guns | | i. Silencers | |
| e. Machineguns | | j. Miscellaneous Firearms* | |
| f. Any Other Weapons | | *Describe here: | |
| g. Short-Barreled Rifles | | | |

## FIREARMS PRODUCED AND EXPORTED OUT OF THE U.S.

9. Number of firearms by type (See definition #5) that were **EXPORTED out of the UNITED STATES** during the reported calendar year you listed above (even if produced in a previous year). **Fill in all totals for items 9a-j. Enter "0" (zero) if no firearm was exported, or if the firearm was only temporarily exported** (See Instruction #6).

| Type of Firearm Exported | **Total** Exported | Type of Firearm Exported | **Total** Exported |
|---|---|---|---|
| a. Pistols | | g. Short-Barreled Rifles | |
| b. Revolvers | | h. Short-Barreled Shotguns | |
| c. Rifles | | i. Silencers | |
| d. Shotguns and Combination Guns | | j. Miscellaneous Firearms* | |
| e. Machineguns | | *Describe here: | |
| f. Any Other Weapon | | | |

**Under penalties of perjury, I declare that I have examined this report and to the best of my knowledge and belief, it is true, correct and complete.**

| | | |
|---|---|---|
| 10. Name: | 11. Title: | |
| 12. Signature: | 13. Date: | 14. Telephone Number: |

ATF Form 5300.11
Revised April 2019

# EXHIBIT E

# GILBREATH LAW FIRM
**ATTORNEYS AT LAW**

E. C. GILBREATH

March 9, 2021

P.O. BOX 1268 (72902)
605 SOUTH 21 STREET
FORT SMITH, ARKANSAS 72901
479-806-6027 – CELL PHONE
479-782--9288 – FACSIMILE
attysatlaw@aol.com

Saeilo, Inc.
d/b/a Kahr Arms
105 Kahr Avenue
Greeley, PA 18425

Re:    Charles P. Finney v. Saeilo, Inc.,
       d/b/a Kahr Arms

Dear Sir:

You are hereby advised:

The attorneys serving this notice and the attorneys representing the claimants/plaintiffs with reference to the captioned matter are as follows:

David P. Price
Law Office of David P. Price, P.A.
P.O. Box 765
Magnolia, AR 71754
870-234-4781
office@dpplaw.com

E. C. Gilbreath
Gilbreath Law Firm
605 South 21st Street
Fort Smith, AR 72901
479-782-7770 - Telephone
479-782-9288 - Facsimile
attysatlaw@aol.com

This letter is notice to you, served pursuant to and in accordance with the terms and provisions of Arkansas Statute 4-2-607(3)(a) of breach of warranty with

reference to a certain product which you sold into the stream of commerce of the United States of America, and that said product was ultimately being used by Charles P. Finney on the date of the accident which occurred on December 24, 2018, as hereinafter more specifically described.

This letter is notice to you of breach of warranties including implied warranty of merchantability, fitness for a particular purpose, and express warranties with reference to a certain product which you sold into the stream of commerce in the United States of America and that said product was ultimately being used by Charles P. Finney, and said notice is hereby given pursuant to A.C.A. Section 4-2-607(3)(a).

This letter is notice that the product herein described which was sold into the stream of commerce in the United States of America and being used by Charles P. Finney was in a defective condition and unreasonably dangerous.

Said subject Kahr pistol, hereinafter described, was purchased online from Sportsman's Guide, and delivered to Shooters Sporting Goods in Magnolia, Arkansas, who handled the FFL transfer.

A description of the product which is the subject of this notice is described as follows: Kahr semi-automatic pistol, Model CW 40, serial number FG4729.

A description of the accident with reference to this notice of claim is as follows:

On December 24, 2018, the Plaintiff, Charles P. Finney, who had a license to carry a concealed weapon, was carrying and had in his possession the afore-mentioned Kahr pistol; at which time said Kahr pistol fell and hit the floor, causing said Kahr pistol to discharge and strike the Plaintiff in the left thigh/leg, causing serious, permanent, and disabling injuries as hereinafter more specifically stated. That the said subject Kahr pistol had not been modified nor changed since the time of the purchase of said Kahr pistol. That at the time said Kahr pistol fell and hit the floor, said Kahr pistol was enclosed in a holster.

You are advised that in connection with the design, advertisement, production, and sale of the aforementioned Kahr pistol, that there was a breach of:

a.     express warranties as contained and defined in Arkansas law;

b.    implied warranty of merchantability as contained and defined in Arkansas law; and

c.    implied warranty of fitness for a particular purpose as contained and defined in Arkansas law.

You are also hereby notified and advised that the afore-described accident of December 24, 2018, was caused by the subject Kahr pistol being in a "defective condition" and said Kahr pistol was "unreasonably dangerous."

Pursuant to Arkansas law, all applicable damages are hereby claimed on behalf of Charles P. Finney which include, but are not limited to, conscious pain and suffering in the past and in the future; past and future medical expenses; diminished ability to work and continue employment; diminished earning capacity; scars, disfigurement and visible results of his injury; and decreased ability to pursue and enjoy hobbies and sports.

Pursuant to Arkansas law, all applicable damages are hereby claimed on behalf of Charles P. Finney.

You are further hereby notified that the breach of warranties, as hereinabove stated, with reference to the design, manufacture, sale and distribution of said unmerchantable, defective and unreasonably dangerous Kahr pistol, was a proximate cause of the injuries and damages to Charles P. Finney.

Demand is hereby made for reasonable and just compensation for damages to Charles P. Finney in an amount in excess of $75,000.00.

Yours truly,

GILBREATH LAW FIRM

By    *E.C. Gilbreath*

E. C. Gilbreath

cc: David P. Price

# EXHIBIT F

I

# JACK BELK GUNWORKS

130 W. Main Box123   Oakley, ID 83346
775 397-4339   jbelk09@gmail.com

November 11, 2021

## REPORT OF FINDINGS
## FIRE CONTROL SYSTEM  KAHR CW-40

After being consulted by two attorneys with different victims of accidental gunshot wounds by the same make and model pistol under strikingly similar circumstances, I obtained two Kahr CW-40 pistols for examination.

### DISCHARGE CIRCUMSTANCES

In both cases in which I was consulted, the gun was dropped from about 30 inches high onto a tile floor.  The bullets traveled upward at an angle, striking the victims in the legs and continuing on an upward path.

### EVIDENCE OF 'DROP FIRE'

Both cases indicated without doubt the gun fired while still in the holster.  Both guns had a fired case in the chamber when recovered by law enforcement. At least one case showed the fired cartridge case to have a firing pin impact mark that cannot be made by pulling the trigger.  The evidence is overwhelming that the guns DID fire when they struck the floor.

### ANALYSIS of the KAHR CW-40

The two Kahr CW-40 pistols I examined are DAO (Double Action Only), polymer-framed, with steel slides.  There are no external safeties showing and the trigger is solid (instead of center-leaf safety). It is a small, flat, light and handy self-defense pistol with single-stacked magazine.  A slide stop on the left side looks and acts like the familiar 1911 design auto and works from the follower to hold the slide open on the last round.  The trigger pull is advertised to be long and hard enough to prevent most accidental firings. One gun has not been examined or tested.  The

2

examined pistol #FF6391 was so long and so hard the trigger could not be pulled to fire it without effort far greater than the trigger scale could read.
   *See Footnote 1*

## ANALYSIS OF HOW THE GUN FIRES

For guns to fire by ignition of the primer, there has to be an **energy source** that impacts the primer sufficient to cause the chemical reaction that near instantly fires the cartridge.  This energy is supplied by a **spring.** In most guns, this 'main' spring drives a hammer that hits the primer, or a striker that does the same thing but runs in a 'tunnel' instead of swinging like a hammer.  The 'firing pin' is the part that hits the primer.  In the Kahr CW-40 the firing pin is part of a striker, so the Kahr CW-40 is a 'striker fired' pistol. Magazine feeding, locking systems and sights are typical of the pistol type.
   The overall operation is "Double Action Only", semi-automatic, single-stacked magazine fed.   There exist several dozen similar pistols by various manufacturers.

IMPACT FAILURES-- Some guns are defective because a drop or impact causes them to fire. (instead of a trigger pull by the shooter)

 In drop fire instances, the energy to fire the gun is usually supplied by gravity and the impact of the fall is transferred to the primer. The path of energy from impact point to primer is easy to see and trace.
 A similar gravity instance would be an object falling and impacting the gun that then transferred the energy to the primer.  In both cases, gravity is the energy used to fire the gun.
 A third way impact can fire a gun is to disconnect critical parts that are keeping the gun from firing by 'cocked' main spring pressure.  If the gun is 'cocked', jarring the mechanism makes it becomes 'unstuck' and fires without a trigger pull.

 The CW-40 does not have an exposed part that transfers gravity impacts to the firing pin. There is no hammer, only a firing pin with a lug to engage the sear, so it becomes a **striker.**  The striker, like a hammer, gets its energy from a strong spring located behind it.
The only part in a CW-40 that can strike the primer is the firing pin-striker and, as a DAO gun, the firing pin is a striker that gets its energy from the compression of the  spring by the **trigger**. The shooter controls the trigger.

3

So, where does the energy come from in the CW-40 that fires it when dropped? The trigger hasn't been pulled.

## THE GLOCK KINSHIP

Like the Glock pistols before it, the CW-40 uses a differential in strength between springs to close the slide over the resistance offered by the firing pin-striker spring. By design, the sear catches the striker about .400 short of the slide closing, but because the recoil spring is stronger than the firing pin-striker spring, the striker is cocked that significant amount when the slide is closed. This system reduces the trigger pull for more accurate shooting. It also supplies enough force to fire the gun without further cocking action by the trigger. The gun is naturally 'cocked' anytime the slide is closed.

## THE SAFETY

The safety in the CW-40 is passive in nature. The shooter has no separate step to perform to 'take the safety off'. The safety is a firing pin blocker that is held in position by a spring and moved out of position so the firing pin can pass by a 'leg' of the rotating sear which is controlled by the trigger. In theory, as the trigger is pulled by the shooter, the sear rotates which pushes back on the firing pin-striker while simultaneously dislocating the firing pin block/safety so the firing pin-striker will rush forward and fire the gun when the sear rotates downward to disconnect from the striker. The safety system is very similar to many other guns in the same class. At first glance, it seems infallible. The safety is operated by the trigger which is operated by the shooter who is the energy supply for the striker by pulling the trigger, but there is no doubt these guns can fire by dropping, so how does it do it? The striker-block safety has to be moved out of the way so the firing pin-striker can go forward to the primer, and the striker has to slip off the sear for it to fire. That would be a two step failure that has to happen near simultaneous to allow the cocked pistol to fire.

How did the 'safety' fail? Is the firing pin block safety **displaced** or was it **over-ridden** or did it just **not activate**?
All three mechanical failures are possible in this gun.
It takes less than ten ounces of pressure to dislocate the firing pin-striker blocker safety by only .032" (1/32) at which point it is disengaged. The inertia of the

4

impact of the gun on the floor could displace the firing pin block safety enough to allow the firing pin-striker to go forward and fire the gun.

A more likely scenario has the firing pin block safety disengaged by simple over-ride from impact of the firing pin-striker. The safety consist of a tiny 'rind' of metal approximately .040 thick cast into the safety part. This 'step' is impacted by a corner of the firing pin-striker to prevent further forward movement of the firing pin-striker. The step is impacted by the firing pin-striker at near full strength. Neither potential engaging surfaces are precision ground and both show small radii. This would indicate the slamming of the firing pin-striker into the tiny ledge of the firing pin block could over-ride the ledge and allow the firing pin to hit the primer.

The weak firing pin block safety spring is the only thing the locates the safety part in the proper location. Debris, gummy lubrication and firing residue all conspire to prevent gun parts from proper movement and this safety with weak spring is a prime candidate to stick in the 'up' position and therefore be totally ineffective without the shooter knowing the gun was being carried 'cocked and off safe'.

Given the weak return spring which determines the location of the safety, the extremely small and roughly shaped safety surface of uncertain heat-treat, and the strength and velocity of the firing pin-striker from the nearly full cocked position, the firing pin block safety is not safe in practical application and makes the CW-40 pistol unduly dangerous to carry in a loaded condition.

## THE SEAR-STRIKER RELATIONSHIP

The sear is pivoted to the pistol's frame. The firing pin-striker is contained in a tunnel in the pistol's slide. The fit between slide and frame is of utmost importance as are other tolerances that effect the security of the sear and striker interface. Since the striker is in the slide and the sear is mounted to the frame, the fit between parts must be precise to maintain the engagement between the critical parts.

The sear operates by bell crank rotation which pushes the firing pin-striker further back against its spring. When the rotation is sufficient, the firing pin-striker slips off the sear and snaps forward to fire the pistol. The movement of the sear is about .150 to the rear. That means the sear pushes the firing pin-striker back against the spring pressure by about .150 as the final means to fire, but that firing pin-striker

5

striker is already cocked by about .400. The gun is about three quarters cocked anytime the slide is closed.

The energy is present within the gun to fire it by its own striker spring. All that's needed is displacement of the sear-striker interface to disconnect them at the instant of hitting a hard floor and the gun will fire. This is a defect, of course, because it can drop fire which makes it extremely dangerous to the shooter and bystanders.

## EVIDENCE OF FIRING AT IMPACT

In addition to two eyewitnesses, a dent in the floor, a blown out holster, a fired case still in the chamber and the upward trajectory of the bullet, one fired case showed a unique firing pin mark that indicates a firing of the pistol other than by pulling the trigger.

Auto pistols such as the CW-40 are 'recoil operated' with a cam locking system where the barrel and slide are locked together at the moment of closing by way of a pin in a slot that cams the barrel up and down to lock and unlock the slide from the frame. Some pistols have inertia or retracting firing pins but the Kahr CW-40 does not. The barrel starts to move downward while still locked to the slide. This motion while still locked, combined with no firing pin-striker retraction, means the firing pin nose is still 'buried' in the primer indent as the barrel starts being displaced as it unlocks. This makes a 'finger flick in cake icing' firing pin mark in each primer that's easily seen by naked eye.

The subject fired case was recovered within minutes by police **from the chamber of the pistol.** The place of recovery of the fired cartridge indicates the slide could not have operated properly. The firing pin mark shows the slide 'bounced' and left a dual round mark instead of the normal finger flick smear. The firing pin mark is clear indication of a gun that fired with the slide hard against a hard surface and could not have been held by hand.

## CONCLUSIONS OF THE EVENT

It is abundantly clear the CW-40 pistol fired when it hit a hard floor. It left a mark. The end of the holster was blown out. The case was still in the chamber. The

6

primer was marked much differently than a hand fired case. The bullet path was clearly upward at an angle and bullet came to rest where it would be expected in a nearby wall after penetration of the victim.

## EXPLAINATION OF THE EVENT

The gun was loaded in chamber and accidentally dropped on a floor. Even though a passive safety design was present, this safety was over-ridden or non-operational and was defeated by gravity and inertia. In addition and at the same time, the engagement between the sear and the firing pin-striker was lost allowing the gun to fire.  The energy to displace the parts came from gravity. The energy to fire the gun was already present because with the slide at rest it is approximately 72% in the cocked condition.

## POSSIBLE AND PRACTICAL SOLUTIONS

Firing pin-striker block safety---

   By design, the firing pin-striker blocker safety is not in contact with the firing pin-striker but is instead located forward of the striker position when the slide is closed.  This gives the firing pin-striker a 'running head start' before slamming into a tiny ledge in the firing pin block safety.  This is not optimal from a mechanical standpoint and has proven to be an ineffective safety.  Not only are the impact surfaces meant to catch the striker small and ill-shaped, the spring that locates the safety is very weak and likely to not locate the safety in the proper position to prevent unintended discharges. Multiple alternative designs are available that places the safety closer to the striker and with more engagement between parts. The common 'gap' between the sear and striker while on safe is less than .030". The Kahr is nearly .400".

Sear Striker engagement--
 The actual engagement cannot be directly measured by sight, but judging by wear patterns on both parts, is judged to be about .040" in the exemplar gun.

At the time of the accident, the sear and striker separated at impact, whether by a 'stacking' of tolerances between frame and slide and frame and sear pivot pin and between firing pin-striker and the tunnel in which it runs, is unknown but certainly

7

plausible these parts could separate under impact by stacking of factory tolerances. Tighter tolerances would prevent firing except by trigger pull.

## SUMMATION

The Kahr CW-40 pistol examined (#FF6391) is assumed to be representative of the make and model and analogous to the accident gun. By close examination of the exemplar gun there can be seen weaknesses that explain the accidental drop fire while recognizing the attempts to prevent it. The fact that at least two of the guns have drop fired, it's safe to 'catalog' this gun design as one meant to be safe but proved to be insufficiently safe when applied to a firearm. The safety has proven to be too weak to prevent firing from a simple drop from about waist high.
 The defects found in the Kahr CW-40 are analogous to the weakness of safety design in the Single Action Colt and all its clones, including the very popular Ruger SA line until it was changed to a safer design in 1973. The 'safety' in the early guns, while well intentioned, were too weak to withstand common impacts like a falling saddle stirrup hitting the hammer. Those guns are not safe to have a live cartridge in line with the firing pin.

The difference of course, is that the Kahr fails sporadically and without evidence of failure from any parts. Duplication of the event is highly unlikely due to the random nature of the failure.

 The Kahr CW-40 could be made safer from similar accidents by simply replacing the firing pin blocker spring by one of more strength. There is over-powering leverage exerted by the trigger and a light spring is of little benefit in trigger pull. The sear-striker interface should be greater than the total of the stacked tolerances to assure adequate security until the trigger is pulled.
 A more comprehensive re-design of the passive safety system to place the active portion of the safety closer to the striker and with more movement needed to disengage it, would be safer still.

## SAFETY TEST AND REALITY

The testing done on firearms mechanisms in development, production and post production inspections concentrate on functional details and can identify mechanical defects if they show up during the limited testing often enough.

8

According to NSSF (National Shooting Sports Foundation) estimates, American firearms are thought to be shot about one box of ammunition a year as a rough average. Field testing, by actual use by customers, is a more intense and realistic 'test' of a firearm's reliability and longevity because the number of chances of failure is greatly increased with added use and public exposure. For this reason, costumer complaints of safety issues must be taken seriously and reasons for failures found, users notified, and the defect corrected.

"Safety testing" by SAAMI, California and possibly others rely on simply dropping a firearms from a set height onto a standardized surface in several different orientations so that dropping forces are applied in multiple directions. Guns that don't 'fire' on impact are said to be 'safe'.
In reality, a gun can be dropped, thrown, slid or impacted in a near infinite number of orientations from various heights and conditions and land or any number of surfaces. This is a reality of a gun carried on the person.

The question asked of the standardized test is "Did it fire when dropped?"
The question should be "Can it fire when dropped?"
The Kahr CW-40 can fire when dropped and evidence shows they have in fact fired when accidentally dropped from about waist high onto a hard surface. Serious injury or death can result from such uncontrolled firing of a deadly weapon.

There are no warnings or recalls listed on the internet and local shops have not been notified of the defect as of this date (11-11-21)

## CONCLUSIONS

The Kahr CW-40 is by definition unduly dangerous due to it firing without pulling the trigger. From examination of exemplars, it is clear the only safety device installed is deficient and does not interpose itself effectively to prevent firing should the sear-striker interface fail under impact.

The examination explains to a high degree of mechanical certainty that the gun is unduly dangerous to carry in the normal (loaded) condition and is a constant danger to the shooter/carrier and by-standers because the design and construction of the gun does not render it safe against a simple fall from modest height. Gravity

10

Based on my analysis of the facts in this Kahr CW-40 case; and my background, education and training, and my many years of experience in investigation, analysis and reports concerning firearm accidents, and matter stated in my resume attached hereto, it is my opinion that the Kahr CW-40 is defective and unreasonably dangerous and should not be sold for use by any person until the aforementioned defects are corrected in said Kahr CW-40 pistol that would prevent a DROP FIRE. It is further my opinion that appropriate public notice should be given to all owners of said Kahr CW-40 pistol as to the defective and dangerous conditions in said Kahr CW-40 pistol; and that said pistol should not be used until such corrective measures have been made and incorporated into said CW-40 pistol. A DROP FIRE of a firearm can cause serious injury; and I have been involved as an expert in one case where the DROP FIRE was the cause of death.

# H.J. (JACK) BELK, JR

PO Box 123
Oakley, ID 83346
775 397-4339
jbelk09@gmail.com

## RESUME'

**Born:**

June 10,1946. Tallahassee, Florida

**Education:**

Twelve years public schools in Florida.

U.S. Army Sept 14,1964- Sept 13, 1967. Trained as Artilleryman, then small arms and supply. Numerous seminars and schools. Honorable Discharge.

Colorado School of Trades (Gunsmithing) Oct 1967-Mar 1969. Certificate of Completion with honors and awards. Certified hunter safety instructor, Colorado.

Law Enforcement Minimum Standards School 1970. Course of study included crime/accident scene investigation and evidence collection, firearms safety and use, and all other subjects proscribed by law for the certification of law enforcement agents. Certified- Florida. Additional seminars, workshops and classes for advanced skills in investigations and enforcement.

**Job History:**

March 1999 to present. Semi-retired as caretaker of a very remote hot springs sites with full shop and laboratory facilities. Jack Belk Gunworks continues to build, modify, and design fine sporting firearms as well as analyze firearms designs and functions and give testimony when needed.

October 1998 to March 1999. Glunt Industries, Warren, Ohio. Sales representative covering all states west of the Mississippi River.

July, 1990 to 1997; Tricon Metals and Services, Birmingham, Alabama. Field sales and service representative for parts of five Western states. Strong metallurgical training.

April 1993 to 1995; President of American Custom Gunmaker's Guild.

June 1989 to July 1990; Sales Representative for Rockmount Research and Alloys, Vancouver, Washington. Welding metallurgy and processes.

August 1986 to June 1989, Co-Owner and Operator of Belk and Shanks Gunworks, Carbondale,

Colorado.

March 1986 to August 1986; Machinist for Baker Mine Service, Glenwood Springs, Colorado. Mechanical and hydraulic design and repair.

February 1986, Consultant to B&B Imports, Memphis, Tennessee. Trip to England and Scotland for firearm inspections, selection, purchases, and safety testing, marketing and advertising.

January 1978 to August 1986, Owner and Operator of Glenwood Gunworks, Inc. Glenwood Springs, Colorado.

June 1976 to January 1978, Instructor at Colorado School of Trades, Lakewood, Colorado.

July 1975 to June 1976, Manager of "The Outdoors Shop" Tallahassee, Fla.
January 1971 to July 1975, Criminal Shift Deputy Sheriff, Leon County, Florida.

March 1969 to January 1971, Gunsmith for Jackson Gun Shop Tallahassee, Fla.

October 1967 to March 1969, student at Colorado School of Trades, (Gunsmithing) Lakewood, Colorado.

February 1966 to Sept 1967 U.S. Army, Ft Benning, Ga. Army Training Center. (Boot Camp)

Jan 1965 to Jan 1966, U.S.Army, Camp Santa Barbara, South Korea. 2nd and 76th Artillery. I Corp. Small arms and supply. Battalion small arms inspector and instructor.

Sept 1964 to Jan 1965, U.S. Army, Ft Jackson S.C. and Ft Sill, OK.


**Experience:**

Started at about age five studying, shooting, and learning guns of many types. Designed first firearm at twelve and finished building first rifle at fifteen.

Trained in the Army as Artilleryman at Ft Sill, OK. Changed MOS to Supply/ Small arms in Korea 1965. Duties included examination and inspection of over one thousand small arms of several types and the field testing of new weapons.

Taught Small Arms maintenance, use, and marksmanship at Ft. Benning Ga. 1966-1967. This teaching was in the classroom as well as in the field.

Attended and graduated from Colorado School of Trades 1967- 1969. Graduated with honors and awards. Certificate of Completion and certified hunter safety instructor for Colorado. Was a member of the Colorado Game and Fish advisory board for handgun hunting and helped develop proficiency test for handgun hunters.

Worked as full time gunsmith doing general repair and custom work at Jackson Gun Shop in Tallahassee, Fla. 1969-1971.

Owned and operated Belk's Custom Guns in Tallahassee during time served as Deputy Sheriff. 1971-1975

Full time criminal shift Deputy Sheriff handling everyday complaints and investigations. Also acted as firearms consultant to Leon County Sheriff's Dept. in numerous assault, murder, and accident cases, 1970-1976.

Full time instructor at Colorado School of Trades as a certified trade school instructor 1976- 1978. Handled hundreds of firearm problems and taught safe handling and general gunsmith topics to approx. 200 full time students. Job description was "Stockmaking Instructor (Days)", but was certified and called upon on a daily basis to teach and troubleshoot firearms malfunctions, internal, external and terminal ballistics and handloading problems and advice, hunter safety, practical shooting, machine shop, welding, business practices, and design and function of firearms of all types.

As owner of Glenwood Gunworks, Glenwood Springs, Colorado, handled general repair and maintenance of hundreds of firearms and acted as consultant to local law enforcement personnel. 1978-1986

Maintained full service gunshop and concentrated on custom guns at home shop until formation of Belk and Shanks Gunworks in 1986.

Active Charter Member of the American Custom Gunmakers Guild until 2002 and have served as Director(two terms), and as President (two terms). I also served as a member of the Membership Committee, auctioneer, and Master of Ceremonies of the annual banquet for ten years. 1983 to 2002.

Served as writer and narrator of the ACGG educational video tape, "An Introduction to Custom Guns", available for sale in many outlets and at, http://gunshop.com/acgg.htm

The study and love of firearms and their operation is a constant process. Public speaking to local groups and boards has been undertaken. As a result of testimony in public hearings I was assigned to a study group to report to the County Commissioners concerning changes in ordinances to promote safe shooting in Twin Falls county, Idaho. Suggestions adopted by ordinance.

As owner and sole operator of Jack Belk Gunworks, A wide variety of firearms work is done. Present work and projects include, but are not limited to, repair, rebuilding and design and construction of a wide variety of sporting arms.

My interest in gun safety has been unfailing throughout my career and have become conversant with safety mechanisms, trigger groups, jar-off factors and incidents in long guns, including but not limited to Remington, Winchester, Mossberg, Ruger, Browning, etc. Capable of disassembly, microscopic inspection, identification of parts modifications or deviations from factory specifications, dates of production, fire control revisions, examination of model drawings, gun examination reports related to various models of incident firearms, determination of trajectory, velocities and all discharge-related variables. Also experienced in evaluation of toolmarks and identifying characteristics of firearms and firearm evidence. A wide and comprehensive knowledge of ammunition including factory and reloads, hangfires, misfires, malfunctions and defects in virtually all American and European long guns and handguns, both sporting and military.

I have qualified as a firearms expert in cases involving allegations of defective and unreasonably

dangerous firearms by reason of manufacturing defect or general safety mechanism deficiencies in both federal and state courts. I am familiar with Daubert-Kumho standards.

I have personally developed in association with John T. Butters, a Registered Engineer in Houston, Texas, a passive intercept safety mechanism that has been developed and patented for commercial use. That patent is now inactive.

Attorneys in a number of cases have elected to utilize the safety mechanism adaptable to virtually any long gun (rifle, shotgun) as a demonstrative aid in visually presenting to the jury the manner in which jar-offs / accidental discharges can be prevented by way of a feasible and economical alternative design. I can also generate firearms-related exhibits for purposes of trial.

**Publications:**

Several articles written by me have been published concerning firearms and their use. Subjects include gunshop security, math for gunmakers, how-to articles on unique firearms designs, the care and repair/rebuilding of faulty factory rifles, and accuracy hints and tips. Custom gun work by me has been featured in international magazines and have graced the cover in at least one instance. I've been interviewed by national broadcast and cable news channels and have clarified firearms designs through publication of articles in hard print and internet.
   "Unsafe by Design—Forensic Gunsmithing and Firearms Accident Investigations" was published in December, 2014 by Truth 'n Shootin' Books. **ISBN-10:** 0692343504 **ISBN-13:** 978-0692343500

I have served as consultant on numerous shooting sports ranges and in matters concerning the safety concerns of shooters and observers.

I am passionate in my love and interest in firearms and sincerely believe in their use, study, and promotion. I continue to do my part to assure that all firearms are understood for what they are: fascinating mechanical devises that can be explained in simple terms to anyone.

References supplied at your request.


                                        H. J. (Jack) Belk

# *JACK BELK GUNWORKS*

PO Box 123 Oakley, ID 84446  775 397-4339

## Belk's Case Listing

| Case Name | Venue | Date | Comment |
|---|---|---|---|
| Emerson v. K Mart | Federal Court, Springfield, Missouri | 1993 | Deposition and trial |
| Alecsich v. Remington | Federal Court, Butte, Montana | 1994 | Deposition  (two) |
| Kuebler v. Remington | Federal Court, Little Rock, Arkansas | c.1994 | Deposition (three)  and trial |
| Sanchez v. Remington | District Court, Falfurrias, Texas | c.1994 | Deposition  (two) and trial |
| Garza v. Winchester | District Court, Texas | c.1995 | Deposition |
| Whaley v. Remington | Federal Court, Birmingham, Alabama | c.1995 | Deposition |
| James v. Remington | Federal Court, Davenport, Iowa | 1999-2000 | Depositions (two) and trial |
| Livingston v. Weatherby/Howa | Federal Court, Charleston West Virginia | c.2001 | Deposition |
| West v.  NAArms | DistrictCourt, Anchorage, Alaska | 2004 | Depositions (2) and trial |
| Williams v. Remington | Federal Court Dallas, Texas | 2005 | Deposition and trial |
| Unk def. -Murder | District Court Laramie, Wyoming | 2005 | Trial |
| Pardue  v. State  of MO. Murder | District Court Springfield, Missouri | 2010 | Deposition |
| Hull v. Remington | Federal Court Tacoma, Washington | 2010 | Deposition and trial |
| Bledsoe v. Remington | Federal Court Dallas, Texas | 2010 | Deposition |
| Jain v. MML/Knight | District Court Eau Claire, WI. | 2009-2011 | Depositions (4) and trial |

| Jain v. MML/Knight | District Court, Eau Claire, Wisconsin | 2012 | Trial |
| Savant v. Beretta | Federal Court, Fort Smith, Arkansas | 2006 | Deposition |

Remington Pollard    Twin Falls, ID    October 2015    Deposition

State of Wisconsin v. Thomas Tate   Oconto, WI    January 2016    Testimony at trial

Remington v. Pollard   Kansas City, MO    March 15, 2017    Testimony (from podium) in final hearing.

Barthel v. Cobra Arms    March 28, 2018    Deposition

Shearhouse v. Remington    June 13, 2018    Deposition

Barthel  v. Cobra Arms    September, 2018    Deposition

Barthel v. Cobra Arms    Follow-up deposition on alternate design.

The above table is accurate and correct to the best of my knowledge.

Jack Belk

## JACK BELK GUNWORKS

PO Box 123 Oakley, Idaho  83346
(775)397-4339

Since 1997 and issue #79, the ACGG has published five items of my writing in GUNMAKER magazine.

Ref:  http://acgg.org/Gunmaker_Index.pdf

| #79 | "1997 EXHIBITION" | Exhibition | Page 8 |
|---|---|---|---|
| #80 | "Rigby cocking piece sight" | Product Review | Page 11 |
| #87 | "Ignorance of Mankind" | Legislation | Page 6 |
| #101 | "Worms for Sale or Rent" | Fiction | Page 17 |
| #103 | "Quality…." | Comment | page 20 |

"Remington Walker Explanation"   October, 2010
Rock Creek Star newspaper, Twin Falls, Co. Idaho

"Remington Walker Explanation" has been published by permission by Safari Clubs in the USA and abroad as well as being posted as copyrighted material on many websites in 2010 and 2011.

"Unsafe by Design?: Forensic Gunsmithing and Firearms Accident Investigations"
**Paperback:** 460 pages

- **Publisher:** Truth 'n Shootin' Books (December 3, 2014)
- **Language:** English
- **ISBN-10:** 0692343504
- I
  S
  B
  N
  -
  1
  3
  :

  9
  7
  8

# EXHIBIT G

# NEW YORK DAILY NEWS ARTICLE

# NYPD BRASS TO COPS: STOP USING KAHR K-9 SEMI-AUTOMATIC PISTOL AS AN OFF-DUTY GUN

## BY: ROCCO PARASCANDOLA
## DECEMBER 12, 2011

# DAILY NEWS

### NEW YORK'S HOMETOWN NEWSPAPER

# NYPD brass to cops: Stop using Kahr K-9 semi-automatic pistol as an off-duty gun



*A gun at the Kahr Arms display at the National Rifle Association's 135th Annual meeting & exhibit. (Debbie Egan-Chin/New York Daily News)*

**By Rocco Parascandola**
December 12, 2011

The NYPD has instructed cops to stop carrying an off-duty gun that has a trigger so light it's been blamed for a series of accidental discharges, the Daily News has learned.

NYPD spokesman Paul Browne says the Kahr K-9 semi-automatic pistol has led to more than a dozen such shootings — none resulting in a fatality. The shootings have occurred over the last few years, a source said.

The NYPD last Monday ordered that the revocation order be read aloud to cops at each precinct for 10 consecutive roll calls.

Kahr Arms has done business with the NYPD since 1997, and more than 5,000 Kahrs have been sold to city cops, said Frank Harris, a spokesman for the gun firm.

Harris denied that the pistol discharges when it is dropped and blamed any accidental shootings on user error.

He admitted that the NYPD raised concerns about the pistol five years ago.

That's when new recruits were told not to buy the Kahr, Harris said.

At the time, the NYPD asked Kahr to increase the trigger weight pull — the pressure needed to squeeze off a round — from 7 1/2 pounds to 13 pounds.

The new threshold is a pound more than the pressure needed to fire a Glock, the gun of choice for most NYPD officers.

The increase would make it more difficult to fire the gun, but Kahr said it couldn't make the change.

"We worked for about three years to try to modify the gun," Harris said.

"After three years trying to meet their requirements, we just had to give up. But we still maintained the guns still in use. We have a very good relationship with them.

"It was a surprise to me that they made this decision."

A lighter trigger pull has the advantage of making the gun easier to fire and to shoot more accurately.

Police departments generally require a heavier pull because they want officers to realize the serious nature of opening fire.

Overall, there were 21 accidental discharges last year, only six of which took place during a confrontation with a suspect, according to the NYPD.

In 2009, eight of the 23 accidental shootings involved a confrontation with a suspect.

*rparascandola@nydailynews.com*

# EXHIBIT H



# EXHIBIT I

The Review of Reviews—Advertising Section

# Hammer the Hammer

without the slightest fear of discharge, if it's an "Iver Johnson." You take no risk even if it is loaded with ball cartridges. *Try it at your peril with any other revolver* irrespective of its price.





The only revolvers which cannot possibly be discharged by accident are the

# IVER JOHNSON

## REVOLVERS

Throw one loaded against a stone wall—on the floor, snap the hammer with your thumb—it cannot "go off" BECAUSE the hammer never touches the firing pin under any circumstances. This is the *exclusive* patent of the "Iver Johnson." Press the trigger and it raises a lever between firing pin and hammer which the hammer strikes, and it *never* fails to fire when you intend it should.

### No Argument is Required as to the Need of a Revolver

in the house, at the office, when traveling. Your only fear is of accidental discharge, which is now entirely overcome to the satisfaction of every reasoning person. Iver Johnson Revolvers are for sale by dealers the world over, but if for any reason your dealer *refuses* to supply you, we will send direct. There is no real substitute; don't accept a make-believe.

PLEASE SEND FOR ILLUSTRATED CATALOGUE, IT TELLS THE WHOLE STORY OF SIZES, STYLES, CALIBRES AND PRICES

Iver Johnson's Arms & Cycle Works
FITCHBURG, MASS.

Iver Johnson
Safety Automatic
Hammer
$5.00
Extra Length Bbls.
50c. per inch

Iver Johnson
Safety Automatic
Hammerless
$6.00
Pearl Stocks
$1.25 extra

Please mention the Review of Reviews when writing to advertisers
51

9

is a constant source of sufficient energy to fire the pistol by dislodging the badly designed and constructed passive safety system contained within the Kahr pistols.

It is clearly seen in Kahr advertisements and sales literature, this family of guns are considered personal defense guns to be carried primarily concealed. They are very economical as compared with almost identical guns with better known names.

The unique, patented fire control system utilized in the Kahr pistols also makes them unduly dangerous for the intended market. There is no safe direction to point an unsafe gun.

At the very least, a warning should be made to owners, dealers, repair shops, national publications and internet repositories of firearms warnings and recalls. These guns can, and have, fired when dropped and have already caused serious personal injuries.

*Footnote #1*

Examination of CW-40 Kahr #FF6391.
    The sear-striker relationship on this exemplar pistol is such that at times the gun is not responsive to any amount of trigger pull and fails to fire with twenty pounds of trigger pressure. A simple alteration of the slide position by pulling up on the rear of it reduces that trigger pull to less than five pounds.
 A shim of .020 (twenty thousandths) between frame and slide, which reduces sear-striker engagement by the same amount reduces trigger pull to ~4 ¾ pounds, which is considered 'very light' in a DAO pistols.
As seen here, the amount of overlap of the sear and striker surfaces greatly effects the security of the gun against uncontrolled firing. That sear-striker overlap is controlled by the fit of more than just the slide. Tolerances can 'stack' and defeat the various parts that work in concert to keep the gun safe. The fixed pivot and rotational sear means the 'final cocking' is variable in length and strength and lacks the consistency of 'pusher bar' systems used in most similar pistols.

The highly variable trigger pull of the exemplar gun is fully explained by the changing position of the slide affecting the critical sear-striker over-lap and demonstrates the unpredictable nature of a pistol with larger tolerances and uncertain operation.

# EXHIBIT J





**BARREL.** Hammer forged from open hearth, high carbon steel, carefully selected and inspected. Rifled on special machinery.

**CYLINDER.** Milled from hammer refined steel of finest quality. Chambers reduced where shell ends to exact size of bullet.

**FRAME.** This has been reinforced at all points subject to strains. Note unusual depth of metal adjacent to hinge and under cylinder.

**HAMMER AND TRIGGER.** Hammer forged and case hardened.

**SAFETY LIFTER.** Forged from vanadium steel, the hardest and toughest obtainable.

**SPRINGS.** Wire throughout—drawn tempered.

**CYLINDER STOP.** Positive in action. Milled from solid bar steel and spring tempered.

**CYLINDER CATCHES.** Cylinder is held to frame by a catch on the hub and by a supplementary one on the barrel catch.

**BALL AND SOCKET JOINT.** This is at point where main spring plunger engages with the hammer. Reduces friction and wear to practically nothing. Case hardened.

**MAIN SPRING TENSION BAR.** Engages with series of notches in frame, at lower end of main spring. Changing from one notch to another adjusts the tension. An exclusive feature.